UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------X
UNITED STATES OF AMERICA   :

   -against-   :                **MEMORANDUM OF DECISION**

EMMA SORIANO   :                18 CR 389 (RJD)

   Defendant.   :
------------------------------------------------X

DEARIE, District Judge

      Defendant Emma Soriano was indicted for importation and possession of heroin with intent to distribute after Customs and Border Protection ("CBP") officers recovered heroin from two plastic containers of food found in her carry-on and checked luggage upon her return from a trip to Mexico. On July 9, 2019, less than two weeks before trial was set to begin, Ms. Soriano filed a motion seeking dismissal of the indictment and an evidentiary hearing after the Government informed her that most of the items seized, including her belongings, had been destroyed by CBP officers, who also failed to prepare any written or photographic inventory of the materials before destroying them. Ms. Soriano argues she has been deprived of the ability to present her defense because the destroyed evidence was the only means available for her to corroborate that she had no knowledge about the contraband in her luggage, and the officers' actions were purposeful and evidencing bad faith.

      After hearing the Government's account of the circumstances under which Ms. Soriano's items were destroyed and reviewing the limited evidence that remains available for her defense, the Court cannot find that Ms. Soriano would be afforded a fair opportunity to defend herself at trial. For the reasons stated below, and with considerable reluctance, Ms. Soriano's motion to dismiss the indictment is granted.

## BACKGROUND

### I. Arrest and Recovery of Contraband

Ms. Soriano works as a "paquetera", or professional food courier, transporting items that are not generally available in the United States from Puebla, Mexico to migrants who live in New Jersey and New York. On July 15, 2018, Ms. Soriano arrived at John F. Kennedy airport from a trip to Mexico for her paquetera business. After retrieving her luggage from baggage claim, she presented her purse, a carry-on bag and three checked duffle bags for examination to a CBP Agricultural Specialist, along with receipts of the items she planned to deliver and prior notice of food importation paperwork required by the Food and Drug Administration. During an X-ray of her luggage, the CBP officer noticed an anomaly in the contents of her carry-on bag and subsequently found two egg-shaped packages containing heroin inside a plastic tupperware of green-powdery seasoning in her carry-on bag.

CBP officers escorted Ms. Soriano to a private room where they searched the remainder of her luggage. Ms. Soriano's checked bags were filled with various packages containing perishable food items and other non-perishable goods she was transporting for her clients and other paqueteros, and many of the packages were labeled with the intended recipient's name. Inside a container of mole, a traditional Mexican sauce, in one of Ms. Soriano's checked bags, CBP officers found two additional egg-shaped packages containing heroin. The officers also recovered additional paperwork for Ms. Soriano's paquetera business from her carry-on and purse, including invoices and power of attorney forms from prior trips with names and addresses of clients for whom she had transported packages.

Ms. Soriano was arrested and brought to an interrogation room to speak with Homeland Security Investigation ("HSI") agents. During the interview, Ms. Soriano denied any knowledge

of the contraband in her luggage and explained that she worked as a paquetera transporting items for clients and other paqueteros.[1] She also explained that she did not pack any of her luggage because she had to take her mother to the hospital in another city in Mexico, so one of the workers from her paquetera business, Raul, packed the carry-on and brought it to her before she left for the airport. Similarly, the duffel bags were delivered to her fully packed with items for another paquetera by a woman named China before she went to the airport. Ms. Soriano explained she did not check any of the contents of the bags when they were delivered to her because she was running late to catch the bus to the airport.

## II. Destruction of Ms. Soriano's Belongings

According to the Government, CBP does not routinely store perishable food items recovered from seized luggage. Thus, after CBP officers searched the contents of Ms. Soriano's luggage and recovered the contraband, with the HSI agent's permission and without consulting the United States Attorney's office, they destroyed all the perishable items in the luggage along with other items which, according to the Government, the officers deemed to have no evidentiary value. This included all the contents of the three checked duffel bags, including non-perishable items, and the three duffel bags themselves. The only items the officers retained were the contraband, Ms. Soriano's carry-on bag, one empty plastic container and the paperwork recovered from Ms. Soriano's purse and carry-on bag.

The officers did not create an inventory or photograph Ms. Soriano's luggage as it was originally presented for inspection, and only took three photographs of the duffel bags after they

---

[1] These facts are drawn from an audio recording of the initial interview of Ms. Soriano. See Def. Mot. Suppress, Ex. C, ECF No. 20 ("Soriano Interview Recording"). To say the least, the recording shows that Ms. Soriano's interview is hardly a textbook example of ideal interview techniques or how to obtain a Miranda waiver, and this is a generous characterization. The agents romance a Miranda waiver out of a very cooperative and responsive Ms. Soriano, constantly switching back and forth between English and Spanish. In response to a defense motion to suppress, the Government agreed not to use the interview in its case-in-chief.

had been searched. Court Exs. 1, 2, 3, ECF No. 59. The photos show some of the items which were destroyed, including shoes and wooden crafts, but the Government conceded that these items had already been removed from the duffels and were randomly placed back for the photographs. The officers also took two photographs of Ms. Soriano's open carry-on bag with a large open plastic tupperware inside containing two of the egg-shaped packages of heroin. Gov't Opp. to Mot. for Hr'g., ECF No. 52, Ex. B. In the corner of these two photographs, there is an open cardboard box containing a label with an individual's name written on it. Id. None of the discarded items were individually photographed or inventoried before they were destroyed, and there is no record of what each piece of luggage contained prior to being searched or how the items were packaged inside the luggage.

### III. The Instant Motion

On July 9, 2019, Ms. Soriano filed this motion seeking dismissal of her indictment, or in the alternative, an evidentiary hearing prior to the July 22 trial date. The Government opposed both of Ms. Soriano's requests, arguing there was no need for an evidentiary hearing because there were no material facts in dispute and the undisputed facts showed dismissal was not warranted. On July 16, 2019, the Court held a conference to hear from the parties on this issue.

At the conference, the Government disclosed an email written and disseminated by the Chief Enforcement Officer of the Passenger Operations at JFK Airport to CBP officers at the airport on March 14, 2014, which states, in part:

> The U.S. Attorney's Office, New York, has requested that when we seize narcotics/currency and the violator has items that we routinely examine and subsequently dispose of (perishables, food, etc.), that we now take pictures of those items prior to their disposal. Any other nonperishable items should remain with the luggage, this includes containers of items that we may have disposed of during our examination, such as alcoholic beverages, shampoo, powder, etc. This will ensure that all items

4

> that were present when the violator arrived in or departed the United Stated are either present or a record their presence exists. The U.S. Attorney's Office states that there have been a number of cases where those non-essential items have become an essential part of their prosecution.

Id. at Ex. A.

The Government also informed the Court it had produced surveillance videos of Ms. Soriano at the airport with her bags, though the videos only show the unopened duffels and carry-on on a luggage cart and going through the X-ray machine. Id. at Exs. C, D. Finally, the Government disclosed that none of the officers or agents present during the search would be able to testify as to whether the packages in Ms. Soriano's luggage were labeled and what those labels said because too much time had elapsed, but the case agent could testify about some of items found, at least after the luggage had been searched. After expressing concerns about proceeding to trial without developing the record regarding what the officers recalled about the contents of Ms. Soriano's luggage, the Court granted the Government's request to file supplemental briefing on the matter.

Following the conference, the Government again urged the Court to deny Ms. Soriano's request for an evidentiary hearing, arguing there was no material factual dispute for the Court to resolve. The Government expressed its willingness to stipulate that (1) Ms. Soriano worked as a professional food courier, (2) at least some of the items in the destroyed checked bags were labeled with names that matched food courier paperwork recovered from her at the time of her arrest, and (3) at least some of the food contained in the destroyed bags matched the description of food listed in her paperwork. Nonetheless, the Government intended to present evidence that the food courier paperwork Ms. Soriano presented to CBP officers, as well as some other food courier paperwork found in her possession, contained false information about the senders and

5

recipients of the items she was purporting to deliver. It also proffered that it intended to present evidence that Ms. Soriano did not submit the required prior notice paperwork for the individual whose name is written on the one label seen in the photographs of Ms. Soriano's carry-on bag, and that the individual would testify he was not expecting to receive the food items listed in the corresponding paperwork, his address is incorrect on that paperwork and he does not know the supposed sender of the package.

## LEGAL STANDARD

A criminal defendant moving for dismissal of the indictment on the basis of spoliation of the evidence must show (1) the government destroyed evidence which was potentially useful and had exculpatory value that was apparent before it was destroyed, (2) the government did so in bad faith, and (3) the destroyed evidence was of such nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. See United States v. Greenberg, 835 F.3d 295, 303 (2d Cir. 2016); see also California v. Trombetta, 467 U.S. 479, 489 (1984); Arizona v. Youngblood, 488 U.S. 51, 58 (1988).

While the government does not have "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution," the spoliation of evidence violates a defendant's due process rights in situations where "the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." Youngblood, 488 U.S. at 58. The discarded evidence "must be evaluated in the context of the entire record," United States v. Agurs, 427 U.S. 97, 112 (1976), to determine if it is something that "might be expected to play a significant role in the suspect's defense." Trombetta, 467 U.S. at 488.

The court must make a "case-by-case assessment" that examines the discarded evidence's "significance when viewed in light of its nature, its bearing upon critical issues in the case and the strength of the government's untainted proof." United States v. Grammatikos, 633 F.2d 1013, 1020 (2d Cir. 1980); see also Youngblood, 488 U.S. at 60 (Stevens, J., concurring) (cautioning the exculpatory value of evidence may be higher in cases "involving a closer question as to guilt or innocence"); Trombetta, 467 U.S. at 489 (failure to retain breath samples did not violate due process because "in all but a tiny fraction of cases, preserved breath samples would simply confirm the [breathalyzer's] determination that the defendant had a high level of blood-alcohol concentration at the time of the test"). Additionally, the court must decide whether a defendant has other means to obtain comparable evidence, such as through contemporaneous records of the discarded evidence or cross-examination of officers who recovered or examined the evidence before it was discarded. See United States v. Barnes, 411 F. App'x 365, 369 (2d Cir. 2011) ("Barnes could have challenged the DNA expert's results by way of cross-examination"); United States v. Rastelli, 870 F.2d 822, 833 (2d Cir. 1989) (finding defendant could have obtained comparable evidence to discarded tapes of his conversations by "us[ing] contemporaneously prepared F.B.I. summaries of the tape-recorded conversations" or "call[ing] as a witness F.B.I. agent [] who monitored the taped conversations").

Finally, in evaluating the government's culpability, "[t]he presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." Youngblood, 488 U.S. at 56. For example, in United States v. Nichols, the Second Circuit concluded officers did not act in bad faith when they failed to preserve cash recovered from the defendant and failed to record the currency's serial number before depositing it because it was

7

"difficult to imagine how recording the currency's serial numbers could have assisted [defendant's] defense unless she herself had recorded such information for her legitimately earned funds." 912 F.2d 598, 602–03 (2d Cir. 1990).

Moreover, the government does not act in bad faith when the destruction of evidence is the result of negligence or bureaucratic error. Youngblood, 488 U.S. at 58 ("The failure of the police to refrigerate the clothing and to perform tests on the semen samples can at worst be described as negligent."); United States v. Hunley, 476 F. App'x 897, 899 (2d Cir. 2012) (finding police department's failure to place a hold on lab's regularly scheduled destruction of the firearm was "bureaucratic error"). Similarly, there is no bad faith when evidence is destroyed in accordance with normal practice or because there is a specific need to discard the evidence. Trombetta, 467 U.S. at 488 ("In failing to preserve breath samples for respondents, the officers here were acting in good faith and in accord with their normal practice." (internal quotation omitted)); United States v. Pirre, 927 F.2d 694, 697 (2d Cir. 1991) (no bad faith in destruction of bricks of cocaine because "the government's reason for destroying them was administrative: a need for more storage space"); United States v. Prado, 143 F. Supp. 3d 94, 101 (S.D.N.Y. 2015) (destruction of defendant's go-fast boat was "in good faith because … video footage shows that the craft was in the open ocean and loaded with drums of fuel that constituted an obvious hazard").

Of course, the government acts in bad faith when the record shows that evidence was "intentionally destroyed." United States v. Steele, 390 F. App'x 6, 9 (2d Cir. 2010); see also United States v. Ungar, 648 F. Supp. 1329, 1336 (E.D.N.Y. 1986) ("Sanctions will normally follow when destruction is deliberate."). Additionally, the government's failure to retain potentially exculpatory evidence is done in bad faith when the circumstances under which the

evidence is discarded negate any innocent explanation for the government's conduct. In United States v. Beckstead, the Tenth Circuit set out factors that are helpful in assessing when those circumstances exist: "(1) [whether] the government had explicit notice that [defendant] believed that [the evidence] was exculpatory . . . (2) [whether defendant's] claim that the evidence was potentially exculpatory [is] conclusory, or [whether] it is instead backed up with objective, independent evidence giving the government reason to believe that further tests on the destroyed evidence might lead to exculpatory evidence . . . (3) [whether] the government still had the ability to control the disposition of the evidence at the time that [defendant] indicated that [it] might be exculpatory . . . (4) [whether] the evidence . . . disposed of was central to the case, and (5) [whether] the government offered any innocent explanation for its failure to preserve the evidence." 500 F.3d 1154, 1159-61 (10th Cir. 2007); see also United States v. Bohl, 25 F.3d 904, 913 (10th Cir. 1994) (finding that record "[gave] rise to a logical conclusion of bad faith" where government disposed of evidence central to the trial after receiving requests from defendant to test it and after "receiv[ing] substantial independent evidence suggesting that its tests of the [evidence] might have been flawed"); United States v. Cooper, 983 F.2d 928, 931 (9th Cir. 1993) (holding that destruction of equipment was in bad faith because "the equipment's value as potentially exculpatory was repeatedly suggested to government agents" before they allowed its destruction). Thus, if the government destroys evidence when it has notice of its potentially exculpatory value and the destruction is not inadvertent, negligent or pursuant to standard procedure, then the government acts in bad faith.

## DISCUSSION

Ms. Soriano argues her indictment should be dismissed because the contents of her luggage would have been the only means available to rebut the government's theory that Ms.

9

Soriano's knowledge of the contraband in her luggage could be inferred from discrepancies in her paperwork. Without the bags and their contents, complete photographic display of the bags, as they first appeared at inspection, or at a minimum, a written record of what was destroyed, the defense could not demonstrate to the jury she was a professional food courier who was carrying packages for other individuals and was unaware of the contents of those items beyond what she had been told. Furthermore, Ms. Soriano argues the officers acted in bad faith because they destroyed most of the evidence, contrary to policy, when they were on notice it was potentially exculpatory. The case agent approved the destruction of the evidence right after hearing Ms. Soriano's explanation of her paquetera business, so he knew, or should have known from his prior experience working in drug courier cases, how valuable the contents of her luggage were to her defense. The CBP officers also acted contrary to an express directive from their superiors to preserve all non-perishable items and to carefully document any items they discarded.

On the other hand, the Government argues the defense can readily present its theory that Ms. Soriano was a professional food courier using comparable evidence previously disclosed, including her food courier paperwork, travel documents, surveillance video and photographs of the luggage and its contents. Additionally, though the Government acknowledges the officers should not have destroyed the evidence and should have taken a comprehensive photographic inventory of the items before they were destroyed, it argues there is nothing to suggest that the officers appreciated the exculpatory value of any of evidence before its prompt destruction.

As an initial matter, it needs to be recognized that an accurate assessment of the impact of the Government's inexplicable destruction of patently relevant evidence is not possible since the physical evidence is gone and there are no reliable substitutes given the Government's admitted failure to document in any comprehensive form what was destroyed. See Trombetta, 467 U.S. at

486 ("Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed."). There is no inventory or even a summary of what was destroyed; there are no relevant photographs of items as they were found, not even a listing of the contents of the bags or the names on various labels on individual packages and the extent to which those names were consistent with Ms. Soriano's paper records. Except for the contraband hidden in a container of food in Ms. Soriano's carry-on bag, the Government is unable to tell what bags and which packages contained hidden contraband and how such packages were arranged or labeled. And in the apparent rush to destroy evidence, on the heels of hearing Ms. Soriano's explanation of how her bags were packed and how she intended to distribute the items in them, the Government also critically undermined further investigative efforts to understand the complete story of Ms. Soriano's travels and identify those who were principally, if not solely, responsible for serious criminal conduct.

In a case where knowledge is the principal issue, indeed the only real issue for trial, little things can mean an awful lot. When knowledge can only be inferred from an amalgam of established facts, even seemingly inconsequential facts viewed in the context of the overall story can and often do have substantial import for the fact finder. Ms. Soriano, a naturalized American citizen from Mexico who discontinued schooling at age 14, proffers that she is a professional food courier who was unaware of the presence of drugs in her bags. In response, the Government concedes that she is a food courier and insists that since everything in her luggage besides the contraband were items she was transporting for her business, this concession renders her complaint about missing evidence insignificant. The Government is far off the mark.

11

Photographs of each bag before it was searched and the contents therein could lend visible credence to the defense's position that Ms. Soriano is an experienced professional food courier who was transporting various containers for other paqueteros, which were neatly situated in each bag and labeled, in different handwriting, with information about the intended recipients which corresponded to the listing of recipients on the invoices in her possession. Such evidence would allow the defense to argue there was nothing about the bags as they originally presented that would suggest to anyone, Ms. Soriano included, that contraband had been placed in the one or two of the larger packed bags. It is worth noting that during Ms. Soriano's recorded interview, it is apparent that she is pointing out packages within her luggage as her own and others as those of another paquetera. See Soriano Interview Recording, at 14:00.[2] But that position is no longer one the defense can take because not only are the bags and their contents gone, there is absolutely no record of the bags as they were originally presented for inspection. And as long as the Government's unprecedented action requires us to speculate, we do so within the confines of the defense proffer. For example, what if the packages containing the contraband were all labeled in the same way, addressed in the same handwriting to the same person, and not in Ms. Soriano's handwriting? Or what if the two containers with contraband in Ms. Soriano's checked bags were labeled with a name that did not appear in her paperwork? This would lend additional credence to Ms. Soriano's statement that another person packed the bags while she was attending to her sick mother in another city.

The Government attempts to further minimize the challenges its destruction of evidence pose for the defense by tendering photographs showing a duffel with some clothing and other

---

[2] The Court draws this inference from the audio recording of Ms. Soriano's interview because, despite the Court's request for video footage of the entire interview, the government only produced video recordings of the first few minutes of the interview and the secondary interview conducted in a different room. Thus, we are left with only audio of the most relevant portions of the interview.

objects inside, suggesting that these photos have some relevance for the defense. Pictures taken after-the-fact of only some, but not all, items, after the bags were thoroughly searched and all the contents removed have little if any probative worth whatsoever. To suggest otherwise is disingenuous to say the least. Obviously, it dawned on someone that there should be some sort of documentation of Ms. Soriano's belongings. A few things were then haphazardly thrown in a bag, a few pictures taken and then, with remarkable aplomb, the Government offers them to the defense as evidence. Of what, one might ask. It bears repeating that there are no pictures of any of the bags as they first appeared to the inspectors. There are no pictures of the contents, the containers and, with one exception, no pictures of the labels as they were originally packed.

The evidence the Government destroyed was not just something that "might be expected to play a significant role" in Ms. Soriano's defense. Trombetta, 467 U.S. at 488. It was Ms. Soriano's entire defense. The importance of this evidence to establish whether she had knowledge about the contraband in her luggage—the *only* issue for trial— cannot be understated. And the exculpatory nature of the evidence was readily apparent to the agents, who heard Ms. Soriano's candid explanation of the circumstances of her trip before they destroyed all the items that corroborated her story. What is worse is that they did so without maintaining a contemporaneous record of the evidence, thereby extinguishing any alternative means from which she could support her defense.

And finally, there is the issue of bad faith. Given the entirely unexplained, wholesale destruction of evidence supporting the defense by experienced federal agents, the question of good faith seems genuinely out of place and inappropriate. The defense has been irreparably crippled, and even an accurate assessment of the extent of the damage is lost to the unknown as a result of purposeful conduct by a government actor. Under such circumstances it seems that a

discussion of good faith is really beside the point. The damage is done. It cannot be undone. The Court questions whether it makes any difference in this case whether we are addressing a colossal thoughtless blunder or if in fact there is reason to genuinely suspect motivation and deed. Unfortunately, there is. The Court notes the following:

1. The complete and immediate destruction of the bulk of the relevant evidence, including containers, labels, and other contents of Ms. Soriano's bags, with the primary exception being, unsurprisingly, the contraband itself.

2. Done without notice to the United States Attorney (or the defense) in violation of agency policy and a memorandum of understanding with the Department of Justice.

3. Done after Ms. Soriano was thoroughly debriefed by experienced federal agents about her business, the trip in question, her customers and her business associates.

4. The failure to photograph, inventory or otherwise document all evidence, including items specifically referred to by Ms. Soriano during her debriefing.

One final note. In their effort to save the indictment, the Government tenders yet another solution, offering to try the case based exclusively on the contraband found hidden in a container of mole in Ms. Soriano's carry-on bag. Ignoring the obvious question why someone smuggling drugs into the country in large duffel bags filled with food would knowingly hide contraband in her own carry-on bag, the Government suggests that its willingness to proceed without any evidence about Ms. Soriano's checked bags somehow solves the problem. The Government has it backwards. Its imaginative "solution" serves only its own interest by whitewashing its own inexplicable destruction of evidence, insulating itself from its own ineptness that, by itself, would trigger a reasonable doubt, and at the same time eliminating the evidentiary fabric of the defense.

Dismissal of an indictment is a very serious sanction. The Court does not welcome the decision to do so. But fairness begins and ends with due process and, given the circumstances described briefly above, regardless of how one chooses to characterize the Government's behavior—though there are certainly ample indications of bad faith—it is the only available and appropriate reaction if the mandate of due process and fundamental fairness is to be honored. The indictment is dismissed.

SO ORDERED.

Dated: Brooklyn, New York
      August 14, 2019

S/Raymond J. Dearie
RAYMOND J. DEARIE
United States District Judge